UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

R.E.S.V. and J.A.S.V.,[1]

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No.

**COMPLAINT**

## INTRODUCTION

1. This case concerns the tortious treatment and expulsion of a noncitizen mother, Plaintiff R.E.S.V., with her two-day-old U.S. citizen baby, Plaintiff J.A.S.V., to extremely dangerous and unhealthy conditions in Mexico, by agents of the U.S. Border Patrol.

[1]Plaintiffs are filing a motion for leave to proceed under pseudonyms to protect their identities from public disclosure due to the harm and trauma inflicted upon them. Plaintiffs have already disclosed their full names to the relevant government agencies in their administrative claims filed in accordance with 28 U.S.C. § 2675.

2. Border Patrol agents knew or should have known that the timing, manner, and fact of their expulsion placed Plaintiffs in grave danger. Moreover, Border Patrol agents expelled infant J.A.S.V. without regard to his U.S. citizenship and Plaintiff R.E.S.V. without regard to her fear of persecution or torture in Mexico.

3. Plaintiff R.E.S.V. was expelled twice – first when she was almost 9 months pregnant and in pain, and second, when she was still in pain and recovering from the delivery of infant J.A.S.V. via cesarean section. Both times she was expelled without money, food, a cell phone, or a place to stay in Mexico. Plaintiff R.E.S.V. was not from Mexico, but rather, a citizen of El Salvador from where she fled due to her fear of persecution, and thus had no home in Mexico to which to take infant J.A.S.V.

4. As a direct consequence of their expulsion, Plaintiff R.E.S.V. had difficulty providing basic necessities for her baby, as well as for herself, during the 16 days they struggled to survive in Mexico, which is in addition to the time Plaintiff R.E.S.V. was previously expelled to Mexico while almost 9 months pregnant with J.A.S.V after a CBP violently threw her to the ground and pinned her with his knee placing great pressure on her abdomen before her expulsion.

5. U.S. Border Patrol agents carried out each expulsion under the purported authority of an interim final rule issued by the Centers for Disease Control and Prevention (CDC) under 42 U.S.C. § 265. However, the expulsions of Plaintiffs

directly violated the rule and implementing guidance, which prohibited its application to U.S. citizens like Infant Plaintiff J.A.S.V., and to noncitizens who fear persecution or torture in the country of expulsion like Plaintiff R.E.S.V. In addition, the stated justification for the expulsion authority—prevention of the introduction of COVID-19 into the United States—was not at issue, as Plaintiff R.E.S.V. had, at minimum, been thoroughly evaluated by hospital medical staff and discharged without mention of COVID-19 concerns.

6. Plaintiffs bring this suit under the Federal Tort Claims Act (FTCA) to seek compensation for the harm and losses they suffered as the result of the tortious conduct committed by U.S Border Patrol agents. *See* 28 U.S.C. §§ 1346(b)(1), 2671 *et seq*.

**JURISDICTION & VENUE**

7. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question) and 1346(b) (United States as defendant).

8. Plaintiffs submitted timely administrative claims under the FTCA to the U.S. Department of Homeland Security (DHS) and its component agency U.S. Customs and Border Protection (CBP), of which U.S. Border Patrol is a sub-component agency. CBP denied the administrative claims of Plaintiffs and their request for reconsideration on June 23, 2023, and May 1, 2024, respectively.

Plaintiffs are now timely filing this Complaint in accordance with the FTCA. 28 U.S.C. §§ 2675(a), 2401(b).

9. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

**PARTIES**

10. Plaintiff R.E.S.V. is a citizen of El Salvador who resides in Waterford Township., Michigan. Fearing persecution and torture in her home country, R.E.S.V. fled El Salvador with her partner (now wife) R.R.R. and sought refuge in the United States. She is the mother of Plaintiff J.A.S.V.

11. Plaintiff J.A.S.V. is a United States citizen, and the son of Plaintiff R.E.S.V., who resides in Waterford Township., Michigan with R.E.S.V. and R.R.R. Plaintiff J.A.S.V. was a two-day-old infant at the time that U.S. Border Patrol agents expelled him to Mexico.

12. The United States of America has waived sovereign immunity as to claims under the FTCA and is properly named as a defendant to each of Plaintiffs' claims under the Act. 28 U.S.C. §1346(b)(1), 2671 *et seq*.

13. All federal officers referenced in this Complaint were acting within the scope and course of their employment and were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## LEGAL BACKGROUND

***The Title 42 Expulsion Process***

14. In a public health emergency, Congress authorized the Executive Branch to "prohibit, in whole or in part, the introduction of persons and property" from countries which it designates. 42 U.S.C. § 265.

*The 2020 Title 42 Regulations and Expulsion Orders*

15. On March 24, 2020, in response to the pandemic caused by the coronavirus disease 2019 (COVID-19), the U.S. Department of Health and Human Services (HHS) issued an interim final rule under 42 U.S.C. § 26 permitting the CDC to suspend the introduction of persons into the United States who may "present a risk of transmission of a communicable disease."[2]

16. According to the rule, the CDC issued the first of several orders providing the DHS with the authority to "suspend the introduction" of noncitizens seeking to enter the United States at and between land ports of entry.[3] The Title 42

[2]CDC and HHS, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons into United States from Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,566, 2020 WL 1330968 (Mar. 24, 2020) (to be codified at 42 C.F.R. § 71.40).

[3]CDC and HHS, Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061, 2020 WL 1445906 (Mar. 26, 2020) [hereinafter Title 42 Order].

Order, effective March 20, 2020, applied to noncitizens without proper travel documents, those whose entry is otherwise contrary to law, and those who are apprehended near the border seeking to unlawfully enter the United States.[4] With certain exemptions, it permitted DHS officers to return such individuals to, *inter alia*, their countries of origin or the countries from which they entered the United States.[5]

17. Critically, the Title 42 Order did not apply to U.S. citizens, lawful permanent residents, members of the armed forces, spouses and children of all three of those groups, or noncitizens with valid travel documents.[6] Additionally, it exempted "persons whom customs officers of DHS determine, with approval from a supervisor, should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."[7]

18. CDC extended and amended the Title 42 Order in April and May,

[4] *Id.*
[5] *Id.* at 17, 067.
[6] *Id.* at 17, 061.
[7] *Id.*

2020.[8] It subsequently published a Final Rule on September 11, 2020,[9] and, with amendments not relevant here, again extended the Title 42 Order on October 16, 2020.[10]

19. The primary stated rationales for the Title 42 Order and subsequent extensions were that the individuals subject to them generally were held for extended periods in CBP facilities while being processed, that these facilities could not accommodate recommended social distancing, and that CBP was not equipped to handle COVID-19 testing of all detained individuals or segregation of those suspected of having the virus.[11]

20. A federal court subsequently ruled that the Title 42 Order was arbitrary and capricious under the Administrative Procedure Act for, *inter alia*, for failing to sufficiently consider that noncitizens may face persecution or torture in the country of expulsion. *Huisha-Huisha v. Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *cert. and stay granted sub nom. Arizona v. Mayorkas*, 143 S. Ct. 478 (2022), *and vacated*

---

[8]*See* CDC and HHS, Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424, 2020 WL 1923282 (Apr. 22, 2020); CDC and HHS, Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503, 2020 WL 2619696 (May 26, 2020).
[9]42 C.F.R. § 71.40 (2020).
[10]*See* CDC and HHS, Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65, 806, 2020 WL 6081986 (Oct. 16, 2020). Amendments after 2020 are not relevant to this claim.
[11]*See, e.g.*, Title 42 Order, *supra* n.3, 85 Fed Reg. at 17,066.

*as moot*, No. 22-5325, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 731-32 (D.C. Cir. 2022) (holding that plaintiffs were likely to succeed on claim that government could not expel noncitizens under Title 42 to a country in which they would be persecuted or tortured).

***CBP's Implementation of the Title 42 Order***

21. In March 2020, CBP implemented the Title 42 Order, and U.S. Border Patrol issued guidance to the field instructing its agents to apply the Title 42 Order to noncitizens seeking to enter the United States from Mexico or Canada at or between ports of entry who are without proper travel authorization or subject to travel restrictions.[12] The guidance further instructed that injured noncitizens could not be expelled under Title 42 but instead were to be processed in accord with existing immigration laws under Title 8 of the United States Code.[13] Additionally, the guidance instructs that, where a noncitizen is subject to expulsion, the agent is not to take the person's property.[14]

22. Further, the guidance instructed that where a noncitizen states a

---

[12]U.S. Customs & Border Prot., *COVID-19 CAPIO* at 1, https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/COVID%2019%20Capio. pdf (last visited Oct. 14, 2024).
[13]*Id.* at 3.
[14]*Id.* at 2.

reasonably believable claim of torture in the country to which they are being expelled, the agent cannot expel them without first referring them to an asylum officer with the U.S. Citizenship and Immigration Services (USCIS) for a screening of their fear claim.[15] Subsequently, following decisions in the *Huisha-Huisha v. Mayorkas* litigation, CBP guidance instructed agents that noncitizens who manifest a fear of return to the country to which they are being expelled under Title 42 must either be exempted from Title 42 and placed in removal proceedings under 8 U.S.C. § 1229a or referred to an asylum officer within USCIS.[16] The guidance further provided examples of manifestations of fear, including an individual's statement that they are afraid of being sent to the country to which they are being expelled or a statement that they were previously or would be harmed in that country.[17]

23. Moreover, CBP has a longstanding policy of ensuring that pregnant women and family units are treated as "at-risk" populations of special concern due to their particular vulnerability.[18] In 2021 and 2022, CBP issued several memoranda

---

[15]*Id.* at 4.
[16]U.S. Customs & Border Prot., *Processing of Noncitizens Manifesting Fear of Expulsion Under 42* at 2 (May 21, 2022), https://www.aila.org/library/cbp-issues-guidance-on-processing-of-noncitizens.
[17]*Id.* at 1-2.
[18]U.S. Customs & Border Prot., *National Standards on Transport. Escort, Detention, and Search* § 5.1 (Oct. 2015) [hereinafter *TEDS Standards*], https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

memorializing the duty of care owed to these populations under this longstanding policy, including with respect to the implementation of the Title 42 Order.

24. For example, CBP instructed agents that "the treatment of women who give birth in CBP custody raises significant humanitarian and public health interests," which require an agent's "serious consideration" of whether an exception to the Title 42 Order is warranted and further explained that:

> Women who have given birth in CBP custody may require additional medical care such that expulsion of the mother may lead to negative health outcomes for the mother and/or her newborn child. Additionally, these women could be expelled at locations or into conditions that make it difficult to safely care for the newborn child and recover from the delivery.[19]

25. CBP agents were also instructed that they "should consider that the public health and humanitarian interests may weigh in favor of an exception from the Order for mothers who have given birth while in CBP custody and require medical attention."[20] Moreover, CBP agents "must first seek approval from a second line supervisor" before expelling a postpartum mother who is determined to require

---

[19] Acting Comm'r Troy A. Miller, U.S. Customs $Border Prot., Pregnancy and Childbirth Guidance 1 (Aug. 18, 2021), https://cbpabusestest2.files.wordpress.com/2021/08/2021-08-18-dhs-cbp-pregnancy-childbirth-guidance.pdf.

[20] *Id.*

medical attention.[21]

***CBP Policies Regarding Pregnant and Postpartum Mothers and Babies***

26. CBP guidance instructs agents that, following the hospital discharge of a noncitizen in CBP custody, Border Patrol agents must follow all immediate discharge instructions while the person remains in custody.[22] Border Patrol agents are required to follow all hospital discharge instructions while the person remains in their custody,[23] which would include obtaining prescription medicine.

27. On information and belief, U.S. Border Patrol has a long-standing policy requiring its agents to provide information to noncitizen parents of U.S. citizen newborns about how to obtain U.S. birth certificates for their child. The policy was memorialized in a memo instructing Border Patrol agents to provide each parent of a U.S. citizen newborn leaving its custody with a "Vital Records

---

[21] *Id.*

[22] U.S. Customs & Border Prot., *Children Born in the United States in CBP Custody or at a CBP Facility* § 6.1.7.4 (May 24, 2022) [hereinafter *Children Born in CBP Custody*], https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/2022_0524_children-born-in-cbp-custody-or-cbp-facilities-directive.pdf; *see also* U.S. Customs & Border Prot., *Policy Statement and Required Actions Regarding Pregnant, Postpartum, Nursing Individuals, and Infants in Custody* (Nov. 23, 2021), https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/2022-Policy%20Statement-%20and-Required-Action-Pregnant-Postpartum-Nursing-Individuals-and-Infants-%20%28signed%29_0.pdf.

[23] *Children Born in CBP Custody*, *supra* n.20, § 6.1.7.4.

Information Tear Sheet" containing the hospital name and contact information for the appropriate state vital records department to help the parent obtain a birth certificate for the child. The Vital Records Information Tear Sheet must be provided in the noncitizen's primary language or must be read to the individual in her primary language by CBP personnel or a contract interpreter.[24]

## STATEMENT OF FACTS

### *CBP assaulted and then expelled R.E.S.V. to Mexico when she was almost 9 months pregnant with J.A.S.V.*

28. On or about May 5, 2021, R.E.S.V., a 27-year-old Salvadoran woman, entered the United States from in or near Piedras Negras, Mexico, arriving in or near Eagle Pass, Texas, with her domestic partner (now wife) R.R.R. Plaintiff R.E.S.V. and R.R.R. were fleeing persecution in El Salvador and they intended to seek asylum in the United States.

29. R.E.S.V. was almost 9 months pregnant at the time she entered the United States. In the early hours of May 7, 2021, after traveling by foot for more than a day, R.E.S.V. and R.R.R. encountered CBP agents. One of the agents shone a flashlight on R.E.S.V., who was visibly pregnant, and then ran towards R.E.S.V.

[24] *Id*. § 6.3.2.

while yelling aggressively; R.E.S.V. raised her hands in the air and told him she was not going to flee.

30. Even though she was not resisting the agent in any way, he grabbed her by the neck and violently threw her to the ground, all the while yelling and cursing at her. She hit the ground with great force and felt a sharp pain in her abdomen. She began to cry, telling the agent she was pregnant. The agent had her lying face down on her abdomen and pressed his knee between her right rib and waist area, which placed great pressure on her abdomen, and he continued to curse at her. The weight of the agent on her body also caused her to feel pain in her abdomen. After the agent released R.E.S.V., R.R.R. had to assist R.E.S.V. to her feet as R.E.S.V. was unable to stand up on her own. The agent then pushed the two women to a CBP vehicle and directed them inside it. At some point, R.E.S.V. and R.R.R. were moved to another vehicle with different agents inside.

31. R.E.S.V. and R.R.R. were taken to a CBP facility, where she told an agent that she was afraid of being sent back to either El Salvador or Mexico and wanted to apply for asylum. She also told the agents that she was pregnant, experiencing pain in her abdomen, and wanted to see a doctor. The agents did not respond to her claim of fear and took no steps to get her medical assistance. Instead, they laughed and said in Spanish that R.E.S.V. was faking her pain and made other

inappropriate comments that, at a minimum, acknowledged that she was pregnant. R.E.S.V. was not given any food or water at the facility, nor did the agents offer the use of a restroom to the almost 9-month pregnant R.E.S.V.

32. Agents confiscated R.E.S.V.'s backpack, in which she had a cell phone, money and snacks. They then completed paperwork on her and R.R.R. After they finished the paperwork on R.E.S.V. and R.R.R., the agents transported the two women and several others between Eagle Pass, Texas, and Piedras Negras, Mexico. At this point, R.E.S.V. was in so much pain that she could barely walk. She asked an agent to help her get out of the vehicle, but he just ordered her to get out of the vehicle and go across to Mexico. R.E.S.V. and R.R.R., both from El Salvador, had no place to stay in Piedras Negras, no money, and no cell phone because CBP did not return the backpack that its agents confiscated from R.E.S.V.

33. In Mexico, R.E.S.V. and R.R.R. started walking, begging anyone they encountered for a place to stay. They eventually found a church that allowed them to spend the day inside but would not allow them to spend the night because of COVID-19.

34. That evening, they were able to contact the pastor at another church, Primera Iglesia Bautista, who found them a room in a shelter. They stayed in this shelter for the next couple of weeks, surviving through the charity of the church

and its members. For several days, R.E.S.V. experienced pain in her abdomen and she was very worried that her baby had been hurt when the agent threw her to the ground and placed great pressure on her body with his knee. The baby was not moving in the way that he previously had moved, and the fear of the lack of movement caused R.E.S.V. serious emotional distress. R.E.S.V. had no money to pay for a doctor's visit, however.

***R.E.S.V. and Infant J.A.S.V.'s Expulsion and Consequent Suffering in Mexico***

35. On or about May 16, 2021, R.E.S.V. and R.R.R. returned to the United States, again at or near Eagle Pass. They walked for many hours, resting for long stretches along the way. Late on May 17 or early on May 18, R.E.S.V.'s water broke and, sometime after this, she began to experience pain. Early on May 18, as they walked along railroad tracks, they encountered two railway workers and asked them to call an ambulance. R.E.S.V. could tell that she was very close to giving birth. R.R.R. continued to walk, while R.E.S.V. waited for help.

36. A CBP agent arrived and, after she told an agent that she was close to giving birth, took R.E.S.V. to a parking lot, where they waited for an ambulance. Although the CBP agent indicated that they wanted to send her back to Mexico, the emergency medical team stated that she was very close to giving birth and had to

go to the hospital. The ambulance then took her to Fort Duncan Regional Medical Center, in Eagle Pass, Texas.

37. At the hospital, doctors performed an emergency cesarean section, delivering J.A.S.V. at 2:27 a.m. on May 18, 2021. While in the hospital, R.E.S.V. attempted to breastfeed J.A.S.V., but was unsuccessful because he was unable to latch onto her breast.

38. Two CBP agents stood outside the door to her room the entire time she was in the hospital.

39. R.E.S.V. was discharged from the hospital with J.A.S.V. on May 20, 2021, at some time between 11am and 1pm. R.E.S.V. was prescribed Ibuprofen at the hospital, and a nurse also told R.E.S.V. that she had high blood pressure before she left the hospital. At the time of her discharge, hospital personnel gave her some baby items, including small bottles of prepared milk and packets of formula. Earlier, R.E.S.V. asked a nurse for clothing, as she only had the outfit she arrived in, which was dirty. A nurse could only find her pants so R.E.S.V. had to wash her shirt at the hospital and leave wearing it even though it was still damp. Hospital personnel then wheeled her and J.A.S.V. out of the hospital in a wheelchair to a CBP vehicle that was waiting for them. The vehicle took them to a CBP facility where agents took her photograph and fingerprints. Meanwhile, several agents

were joking in English, and although she did not understand much of it, she heard one of them say her son's name and believed that they were joking about him. She found this very humiliating.

40. After the agents finished the paperwork, they took R.E.S.V. and J.A.S.V. to a vehicle outside. She had no idea where she was being taken, as no agents had told her anything, but she did not expect that they would send her and her 2-day-old baby back to Mexico, especially given that she was still exhausted and in pain and recovering from major surgery. R.E.S.V. was also extremely worried because J.A.S.V.'s skin and the white part of his eyes looked yellow. She was shocked and distressed when they arrived at the port of entry and the agent told her to walk into Mexico. She again asked to be able to apply for asylum and told the agents that she was afraid of being sent back to either El Salvador or Mexico. Despite this, the CBP agents went forward with her expulsion. CBP agents had confiscated her phone and had not returned it. R.E.S.V. had no money and no birth certificate for J.A.S.V. The only belongings she had were a few diapers and some milk packets and small bottles the hospital had given her for J.A.S.V. It was a hot day outside and agents did not provide or offer R.E.S.V. water at any point from her hospital discharge to expulsion either. Before crossing into Mexico, she asked the agent if she could borrow his phone and thus was able

to call her partner, R.R.R., whom she learned also had been expelled back to Mexico. She arranged to meet R.R.R. in front of a store on a main venue in Piedras Negras.

41. The CBP agents did not take steps to fill R.E.S.V.'s prescription for pain medication before expelling her to Mexico.

42. After crossing into Mexico, R.E.S.V. had to walk about five blocks and climb a flight of stairs to meet R.R.R. While doing this, she had to carry both J.A.S.V., who weighed about 6 pounds, and the bag from the hospital. She was still in great pain from the cesarian section two days earlier, and this exertion made the pain much worse; she feared that by walking and carrying so much weight she would open the wound. R.E.S.V. was also extremely worried about how long she would feed J.A.S.V. She knew the bottles and packets of milk that were given to her by the hospital would not last long. She had no money to buy more milk or formula, and she was unable to breastfeed J.A.S.V. because he was not able to latch onto her breast.

43. R.E.S.V., her partner, and J.A.S.V. returned to the same shelter in which they stayed following R.E.S.V's and R.R.R.'s first expulsion. They were allowed to stay and given food. A few days after they arrived at the shelter, J.A.S.V. developed a fever and experienced convulsions. R.E.S.V. went to the

U.S. port of entry, explained that her son was a U.S. citizen who needed medical attention, and asked that she and J.A.S.V. be allowed to enter the United States for him to see a doctor. The immigration officers refused to allow them to enter.

44. R.E.SV. then took J.A.S.V. to a Mexican hospital, where initially they refused to treat J.A.S.V. because he was not a Mexican citizen. Eventually, R.E.S.V. convinced them to examine J.A.S.V., after which the hospital gave her acetaminophen to reduce J.A.S.V.'s fever. The hospital charged her an additional fee because J.A.S.V. was not a Mexican citizen.

45. Throughout the first week following her expulsion, R.E.S.V. continued to have pain from her surgery. She feared the surgical wound had become infected but was unable to see a doctor because she had no money to pay for such a service.

46. While in the shelter in Piedras Negras, R.E.S.V. learned of a lawyer who might be able to help her. She contacted the attorney who agreed to submit a parole request for her and R.R.R. Both R.E.S.V. and R.R.R. were paroled into the United States on June 5, 2021, pursuant to the process created in connection with the litigation in *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS), (D.D.C. filed Jan. 12, 2021), and J.A.S.V. was admitted with them, as he is a U.S. citizen.

47. R.E.S.V. was expelled from the United States for a combined total of 25 days and J.A.S.V. for 16 days.

## CLAIMS FOR RELIEF

### COUNT I
### FALSE IMPRISONMENT
### (Infant Plaintiff J.A.S.V.)

48. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

49. Infant Plaintiff J.A.S.V. is a U.S. citizen by birth in the United States.

50. The Border Patrol agents referenced above unlawfully and intentionally confined Plaintiff J.A.S.V. following his birth and discharge from the hospital and continuing through his physical expulsion from the United States to Mexico and his extended period of expulsion in Mexico.

51. The unlawful and intentional confinement and physical expulsion from the United States of Plaintiff J.A.S.V. was carried out against the will of his mother, Plaintiff R.E.S.V.

52. As Plaintiff J.A.S.V. is a U.S. citizen, Border Patrol agents lacked lawful authority to physically expel J.A.S.V. from the United States without his mother's consent.

53. The deprivation of Plaintiff J.A.S.V.'s liberty lasted a total of 16 days.

54. During the time J.A.S.V. spent in Mexico after his expulsion, he was confined to Mexico.

55. Under the Federal Tort Claims Act, the United States is liable to Plaintiff J.A.S.V. for false imprisonment.

**COUNT II**
**FALSE IMPRISONMENT**
**(Plaintiff Mother R.E.S.V.)**

56. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

57. The Border Patrol agents referenced above unlawfully and without her consent deprived Plaintiff R.E.S.V. of her liberty by physically expelling her from the United States to Mexico given that she was medically compromised at the time, she had a fear of physical injury, torture, or death if expelled to Mexico, and did not have COVID-19.

58. The deprivation of Plaintiff R.E.S.V.'s liberty lasted a total of 25 days.

59. During the time Plaintiff R.E.S.V. spent in Mexico after her expulsions, she was confined in Mexico.

60. Under the Federal Tort Claims Act, the United States is liable to Plaintiff R.E.S.V. for false imprisonment.

**COUNT III**
**NEGLIGENCE**
**Expulsion Without First Seeking USCIS' Review of Fear Claims**
**(Plaintiff R.E.S.V.)**

61. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

62. Border Patrol agents were prohibited from expelling noncitizens to Mexico without first referring the noncitizen to USCIS for a fear screening. Thus, Border Patrol agents had a duty to make a referral to USCIS when a noncitizen raised a fear claim.

63. Plaintiff R.E.S.V. had a fear of persecution or torture if expelled to Mexico. The Border Patrol agents referenced above knew that Plaintiff R.E.S.V. had a fear of persecution or torture in Mexico.

64. Border Patrol agents expelled Plaintiff R.E.S.V. to Mexico twice without first referring her to USCIS for a fear screening.

65. Border Patrol agents breached their duty to Plaintiff R.E.S.V. by failing to ensure that USCIS carried out a fear screening before expelling her twice to Mexico.

66. As a direct and proximate result of the above conduct, Plaintiff R.E.S.V. suffered substantial damages.

67. Under the Federal Tort Claims Act, the United States is liable to Plaintiff R.E.S.V. for negligence.

**COUNT IV**
**NEGLIGENCE**
**Failure to Provide Medical Care**
**(Plaintiff R.E.S.V.)**

68. Plaintiffs repeat and reallege all the foregoing allegations as though set forth herein.

69. The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, to act with reasonable and ordinary care, so as not to cause harm or injury to the Plaintiffs.

70. Border Patrol agents had a duty to provide R.E.S.V., who was almost 9 months pregnant, medical care after a Border Patrol agent threw her violently to the ground with great force, causing her to feel a sharp pain in her abdomen. The agent also pinned her face down on her abdomen with his knee placing great pressure on her body between her rib and waist, which also caused her pain in her abdomen.

71. R.E.S.V. asked for medical care given that she was pregnant and experiencing pain in her abdomen but was ignored by the Border Patrol agents and instead expelled to Mexico.

72. By engaging in the acts alleged herein, the Border Patrol agents

referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiff R.E.S.V.

73. The Border Patrol agents had a duty to procure R.E.S.V. medical care while she was in Border Patrol custody.

74. Border Patrol agents breached this duty when they failed to procure medical care for R.E.S.V. in the United States and instead expelled her to Mexico without medical clearance.

75. As a direct and proximate result of the referenced conduct, Plaintiff R.E.S.V. suffered substantial damages.

76. Under the Federal Tort Claims Act, the United States is liable to Plaintiff R.E.S.V. for negligence.

## COUNT V
## NEGLIGENCE
## Expulsion to Location or Into Conditions Which Placed Plaintiffs' Health and Safety at Risk (Plaintiffs R.E.S.V. and J.A.S.V.)

77. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

78. The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, to act with reasonable and ordinary care, so as not to cause harm or injury to the Plaintiffs.

79. By engaging in the acts alleged herein, the Border Patrol agents

referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

80. The Border Patrol agents were aware that Plaintiffs were particularly vulnerable given their at-risk status. The Border Patrol agents knew or should have known the grave health and safety danger facing Plaintiffs as a postpartum mother who had undergone an emergency cesarean section only two days earlier and a two-day old U.S. citizen infant upon expulsion to Mexico without basic necessities, and without any support. In expelling Plaintiffs to Mexico in these circumstances, the Border Patrol agents breached their duty of care.

81. As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

82. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

**COUNT VI**
**NEGLIGENCE**
**Failure to Secure Prescribed Medication for Plaintiff While in Border Patrol Custody (Plaintiff R.E.S.V.)**

83. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth therein.

84. The Border Patrol agents referenced above had a duty to Plaintiff R.E.S.V., including but not limited to, to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff R.E.S.V.

85. By engaging in the acts alleged herein, the Border Patrol agents referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiff R.E.S.V.

86. Under, at minimum, the National Standards on Transport, Escort, Detention, and Search Standards, the Border Patrol agents had a duty to procure prescribed medication for Plaintiff R.E.S.V. while she was in Border Patrol custody.

87. Border Patrol agents breached this duty when they failed to procure medication prescribed by the hospital for Plaintiff R.E.S.V. in the United States and instead expelled her to Mexico without medication.

88. As a direct and proximate result of the referenced conduct, Plaintiff R.E.S.V. suffered substantial damages.

89. Under the Federal Tort Claims Act, the United States is liable to Plaintiff R.E.S.V. for negligence.

## COUNT VII
## NEGLIGENCE
## Failure to Provide Plaintiffs with Information About Obtaining a U.S. Birth Certificate (Plaintiffs R.E.S.V. and J.A.S.V.)

90. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

91. The Border Patrol agents referenced above had a duty of care to Plaintiffs, including but not limited to, to act with reasonable and ordinary care, so as not to cause harm or injury to the Plaintiffs.

92. Border Patrol agents had a duty to provide Plaintiff mother R.E.S.V., on her own behalf and on behalf of Plaintiff infant J.A.S.V., with information regarding how she could obtain a U.S. birth certificate for her newborn child.

93. The Border Patrol agents referenced above breached this duty when they failed to provide Plaintiff mother R.E.S.V. with any information about how they could obtain a U.S. birth certificate for newborn J.A.S.V.

94. As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

95. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (PLAINTIFFS R.E.S.V. AND J.A.S.V.)

96. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

97. By engaging in the acts described in the Complaint, the Border Patrol agents referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

98. As a direct and proximate result of the conduct, Plaintiffs suffered severe emotional distress.

99. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT IX**
**ASSAULT: INFLICTION OF BODILY INJURY**
**(Plaintiff R.E.S.V.)**

100. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

101. The Border Patrol agent referenced above intended to cause, or knowingly or recklessly caused, harmful contact when he forcefully grabbed Plaintiff R.E.S.V., who was visibly pregnant at the time, by the neck and violently and painfully threw her to the ground.

102. The Border Patrol agent intended to cause, or knowingly or recklessly caused, harmful contact by causing her to hit the ground with great force and feel a sharp pain in her abdomen.

103. The Border Patrol agent also intended to cause, or knowingly or recklessly caused, harmful contact when he held Plaintiff R.E.S.V. lying face down on her abdomen with his knee pressed between her right rib and waist, causing her to feel pain in her abdomen.

104. Plaintiff R.E.S.V. was harmed by the Border Patrol agents conduct.

105. Under the Federal Torts Claims Act, the United States is liable to Plaintiff R.E.S.V. for infliction of bodily injury.

**COUNT X**
**ASSAULT: OFFENSIVE PHYSICAL CONTACT**
**(Plaintiff R.E.S.V.)**

106. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

107. The Border Patrol agent referenced above intended to cause, or knowingly caused, offensive contact when he forcefully grabbed R.E.S.V., who was visibly pregnant at the time, by the neck and violently and painfully threw her to the ground.

108. The Border Patrol agent intended to cause, or knowingly caused, offensive contact by causing her to hit the ground with great force and feel a sharp pain in her abdomen.

109. The Border Patrol agent also intended to cause, or knowingly caused,

offensive contact when he held R.E.S.V. lying face down on her abdomen with his knee pressed between her right rib and waist, causing her to feel pain in her abdomen.

110. The Border Patrol agent knew or reasonably should have believed that Plaintiff R.E.S.V. would regard the contact as offensive.

111. The contact caused injury and personal indignity to Plaintiff R.E.S.V.

112. Under the Federal Tort Claims Act, the United States is liable to Plaintiff R.E.S.V. for offensive physical contact.

## COUNT XI
## ASSAULT: THREAT OF BODILY INJURY
## (Plaintiff R.E.S.V.)

113. Plaintiffs repeat and reallege all the foregoing allegations as though fully set forth herein.

114. The Border Patrol agent referenced above intended to cause, or knowingly caused, a threat of imminent bodily injury when he started to run toward Plaintiff R.E.S.V., who was visibly pregnant at the time, while yelling aggressively at her.

115. The Border Patrol agent intended to cause, or knowingly caused, a threat of imminent bodily injury when he forcefully grabbed R.E.S.V. by the neck and violently and painfully threw her to the ground.

116. The Border Patrol agent intended to cause, or knowingly caused, a threat of imminent bodily injury by causing her to hit the ground with great force and feel a sharp pain in her abdomen.

117. The Border Patrol agent also intended to cause, or knowingly caused, a threat of imminent bodily injury when he held R.E.S.V. lying face down on her abdomen with his knee pressed between her right rib and waist, causing her to feel pain in her abdomen.

118. The Border Patrol agent also intended to cause, or knowingly caused, a threat of imminent bodily injury when he pushed R.E.S.V. towards the vehicle after he had thrown and pinned Plaintiff R.E.S.V. to the ground.

119. Plaintiff R.E.S.V. was harmed by the Border Patrol agent's conduct.

120. Under the Federal Torts Claims Act, the United States is liable to Plaintiff R.E.S.V. for threat of bodily injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

a. Trial by judge;
b. Entry of judgment for Plaintiffs and against Defendant on Plaintiffs' claims for relief;
c. Compensatory damages in an amount to be proven at trial;
d. Costs and reasonable attorneys' fees;

e. Pre-judgment and post-judgment interest; and

f. Such other and further relief as the Court deems just and appropriate, including all equitable relief to which Plaintiffs are entitled.

DATED this 30th day of October 2024

Respectfully submitted,

*s/ Julianna Rivera Maul*
Julianna Rivera Maul, SBN P75625
**THE LAW OFFICE OF JULIANNA RIVERA, P.C.**
1101 Fifth Ave, Suite 360
San Rafael, CA 94901
Tel: 510-473-2141
Fax: 510-500-9804
julianna@juliannariveralaw.com

*Counsel for Plaintiffs R.E.S.V. and J.A.S.V.*